[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-11494

_____

D.C. Docket No. 5:11-cv-00284-CAR

JANE MCGINNIS,

Plaintiff - Appellee,

versus

AMERICAN HOME MORTGAGE SERVICING, INC.,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(August 22, 2018)

Before TJOFLAT, ROSENBAUM, and BRANCH, Circuit Judges.

BRANCH, Circuit Judge:

American Home Mortgage Servicing, now known as Homeward, appeals the

denial of a new trial concerning an award of punitive damages arising from a

wrongful foreclosure. Jane McGinnis, the owner of several rental properties, brought suit against Homeward, the servicer of seven of her residential properties' mortgages, alleging wrongful foreclosure, conversion, interference with property, and intentional infliction of emotional distress. The jury found against Homeward on all claims and awarded McGinnis $3,506,000 in damages ($6,000 for economic injury, $500,000 for emotional distress, and $3,000,000 in punitive damages). Homeward appeals the district court's denial of a motion for a new trial, arguing (1) that the punitive damages award was unconstitutionally excessive under the Due Process Clause of the Fourteenth Amendment and (2) that the punitive damages award unlawfully exceeded Georgia's $250,000 cap on punitive damages under O.C.G.A. § 51-12-5.1(f), (g).[1] Because we conclude that the award violates neither the U.S. Constitution nor Georgia law, we affirm the judgment of the district court.

## I.   FACTUAL BACKGROUND

McGinnis owns numerous residential rental properties in Georgia that served as her nest egg. McGinnis entrusted her son, Adam, with managing the properties.

---

[1] "In a tort case in which the cause of action does not arise from product liability, if it is found that the defendant acted, or failed to act, with the specific intent to cause harm . . . there shall be no limitation regarding the amount which may be awarded as punitive damages." O.C.G.A. § 51-12-5.1(f). "For any tort action not provided for by subsection . . . (f) of this Code section in which the trier of fact has determined that punitive damages are to be awarded, the amount which may be awarded in the case shall be limited to a maximum of $250,000.00." *Id.* § 51-12-5.1(g).

McGinnis refinanced seven of her properties with Taylor, Bean & Whitaker ("TB&W"), granting security deeds and promissory notes to TB&W. Her monthly payment to TB&W for one such rental property, located at 172 Hilton Street, was $605.58, including $490.13 for principal and interest and $115.45 for the escrow deposit. On October 17, 2009, Homeward obtained the rights to service McGinnis's seven loans. Homeward sent McGinnis a welcome letter that said McGinnis's payment on 172 Hilton Street for November 2009 was $843.58 without explaining the basis for the increase. McGinnis disputed the increase and paid $605.58 for November. In December 2009, Homeward sent McGinnis an escrow analysis showing a present payment of $843.58, including $490.13 for principal and interest and $353.45 for the escrow deposit. No explanation was given for the high percentage increase in the escrow deposit portion of the payment. The statement described McGinnis's new monthly payment beginning February 1, 2010 as $680.08. McGinnis sent a fax to Homeward asserting that the escrow amounts were incorrect and continued paying $605.58.

On January 15, 2010, Homeward sent McGinnis a letter explaining that the escrow analysis on her loan could have reflected an escrow error and directing her to disregard the December analysis and continue making payments at the previous amount. On February 20, 2010, Homeward sent a second escrow statement that described McGinnis's present payment as $843.59 through March 2010 and her

3

new payment, effective April 1, 2010, as $638.32. Homeward treated the past payments of $605.58 as partial, and held the funds in a suspense account until there were enough funds to pay off the oldest past-due monthly payment. The interest and late fees continued to mount and Homeward frequently contacted Adam and Jane by phone and mail demanding payment. On May 19, 2010, McGinnis sent Homeward a fax explaining that the correct payment for November 2009 through March 2010 should have been $605.58 and providing her own escrow analysis, which was identical to Homeward's analysis with respect to payments after April 2010. The only difference was the $843.58 that McGinnis refused to pay for November 2009 through March 2010 and associated late fees. Homeward failed to explain or retract the $843.48 amount and the issues persisted throughout 2010. McGinnis continued to pay $605.58 until January 2011 when she began paying the $638.32.

From February through May 2011, Homeward returned McGinnis's payments. On March 22, 2011, Homeward sent a formal notice of foreclosure on 172 Hilton Street and finally foreclosed on July 7, 2011.[2] At trial McGinnis testified that the experience traumatized her. Her clinical psychologist, Dr. Andrew Sappington, also testified that the events leading up to the foreclosure were a

---

[2] Each loan was subject to a family rider providing that default on any one of the loans triggered a default on the others. *McGinnis v. Am. Home Mort. Servicing, Inc.*, 817 F.3d 1241, 1247 (11th Cir. 2016). And Homeward's conduct at issue here involved all seven properties. *Id.* at 1249.

4

"major cause of . . . depression" for McGinnis as well as of physical symptoms that included projectile vomiting. McGinnis, who is retired and relies on her rental properties as her income, described the effect of the foreclosure: "I am too old to start over. They have taken my life away from me." McGinnis also presented at trial a letter that Adam had sent a fax to Homeward on December 17, 2009 describing the "und[ue] stress" Homeward's constant demands had caused him and his mother. At trial, McGinnis also presented recordings of phone conversations with Homeward in which Adam mentioned his and his mother's frustration with Homeward's repeated demands for payment and refusal to explain the increase. Homeward's only witness, a default case manager at Homeward, insisted that McGinnis was obligated to pay any amount Homeward demanded whether reasonable or in error.

## II.    PROCEDURAL HISTORY

McGinnis filed suit against Homeward in the United States District Court for the Middle District of Georgia asserting claims of (1) wrongful foreclosure, (2) violation of the Real Estate Settlement Procedures Act ("RESPA"), (3) intentional infliction of emotional distress ("IIED"), (4) conversion, (5) tortious interference with property rights, (6) defamation, and (7) violation of Georgia's Racketeer Influenced and Corrupt Organizations ("RICO") Act. McGinnis sought attorney's fees and punitive damages. After discovery, Homeward moved for summary

judgment. The district court granted summary judgment for Homeward on the RESPA, defamation, and Georgia RICO Act claims.

The case then proceeded to trial, which was bifurcated into two phases: one phase on liability and the other on punitive damages and attorney's fees. At the end of McGinnis's case on liability, Homeward moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a), which the district court denied.

By special verdict, the jury found for McGinnis on all of her remaining claims—conversion, wrongful foreclosure, interference with property rights, and IIED. The jury awarded McGinnis $6,000 in economic damages and $500,000 in emotional distress damages. In the second phase of the trial, McGinnis withdrew her claim for attorney's fees, and the jury found that Homeward acted with the specific intent to cause McGinnis harm and awarded $3,000,000 in punitive damages.

After trial, Homeward filed a renewed motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), and in the alternative, for a new trial on the issue of punitive damages. The district court granted in part the renewed judgment as a matter of law and reduced the punitive damages award to the statutory cap of $250,000 pursuant to O.C.G.A. § 51-12-5.1(g), finding that there was insufficient evidence Homeward acted with specific intent to cause

harm.[3] On appeal regarding Homeward's post-trial motions, we determined that Homeward did not properly preserve the issue of specific intent with regard to punitive damages in its Rule 50(a) motion, and was therefore precluded from raising the argument in its Rule 50(b) motion. *McGinnis*, 817 F.3d at 1261–64. Accordingly, we reversed the district court's ruling that Homeward had preserved the issue of specific intent and vacated the judgment that had reduced the jury's award to $250,000. *Id.* We remanded and instructed the district court to rule on the motion for a new trial on the issue of punitive damages. *Id.* at 1264.

On remand, the district court denied Homeward's motion for a new trial, concluding that the punitive damages award was not unconstitutionally excessive and that the jury's finding of specific intent—a prerequisite to an award in excess of Georgia's $250,000 statutory cap—was not against the clear weight of the evidence. Homeward filed the present appeal.

## III.   STANDARDS OF REVIEW

The district court's "decision that the punitive damages award does not run afoul of the federal Constitution . . . is subject to *de novo* review, though we 'defer to the District Court's findings of fact unless they are clearly erroneous.'" *Action Marine, Inc. v. Cont'l Carbon Inc.*, 481 F.3d 1302, 1309 (11th Cir. 2007) (quoting

---

[3] The district court did not conditionally rule on Homeward's motion for a new trial on the issue of punitive damages.

*Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 436, 440 n.14 (2001)).

"The district court's denial of a motion for a new trial is reviewed for an abuse of discretion." *Id.* (citing *Middlebrooks v. Hillcrest Foods, Inc.,* 256 F.3d 1241, 1247 (11th Cir. 2001)). "Deference to the district court is particularly appropriate where a new trial is denied and the jury's verdict is left undisturbed." *Id.* at 1309 (quoting *Middlebrooks*, 256 F.3d at 1247–48 (internal quotation marks omitted)).

## IV.    **DISCUSSION**

This appeal raises two issues related to the jury's punitive damages award: (1) whether the award violates Homeward's due process rights because it is grossly excessive; and (2) whether the district court abused its discretion when it concluded Homeward is not entitled to a new trial on the basis that there was insufficient evidence Homeward acted with specific intent to harm.

A.    The Punitive Damages Award Is Not Unconstitutionally Excessive.

Homeward argues that the jury's punitive damages award is excessive in violation of due process. The Supreme Court has said that a punitive damages award violates due process when it is "grossly excessive" in relation to the State's interest in punishment and deterrence. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996). The Supreme Court has instructed courts to consider three guideposts

8

when determining whether an award violates due process: (1) the degree of reprehensibility of the defendant's misconduct; (2) the ratio between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Id.* at 575–83. The district court concluded that under those factors the award in this case is not unconstitutionally excessive. We agree and address each factor in turn.

The reprehensibility of the defendant's conduct is the "dominant consideration" in assessing whether a jury's punitive damages award is excessive. *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1283 (11th Cir. 2008). To determine reprehensibility, the Supreme Court has instructed courts to consider several sub-factors: (1) whether the harm caused was physical or economic; (2) whether the conduct evinced an indifference to or reckless disregard of the health or safety of others; (3) whether the target of the conduct was financially vulnerable; (4) whether the conduct involved repeated actions rather than an isolated event; and (5) whether the conduct involved intentional malice, trickery, or deceit rather than mere accident. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) (citing *Gore*, 517 U.S. at 576–77).

On the first *Gore* guidepost, we find a high degree of reprehensibility in Homeward's conduct based on the relevant sub-factors. First, Homeward's conduct

9

caused McGinnis physical and emotional harm in addition to economic harm. McGinnis's psychologist testified that the events leading up to the foreclosure were a major cause of her depression as well as her physical symptoms, including projectile vomiting. Second, Homeward's conduct evinces an indifference to McGinnis's health. Adam informed Homeward in writing that its actions were causing both of them "und[ue] stress." Further, "the sheer volume of adversarial communications . . . and looming threats of foreclosure" that Homeward repeatedly offered reflect that Homeward almost certainly knew its conduct was causing McGinnis emotional harm. *McGinnis v. Am. Home Mort. Servicing, Inc.*, 240 F. Supp. 3d 1337, 1352 (M.D. Ga. 2017).

Third, Homeward knew that McGinnis was financially vulnerable. The seven properties at issue in the foreclosure represented McGinnis's "livelihood, her nest egg, her security, her life's work, and a representation of her character in the community." *McGinnis*, 817 F.3d at 1259. And in the numerous communications with Jane and Adam, "Homeward almost certainly learned the stakes involved with the foreclosure, and yet it never looked back." *Id.*

Fourth, Homeward's conduct involved repeated actions rather than an isolated event. Adam "repeatedly notified Homeward of errors in the handling of [the] account and attempted to resolve the errors in good faith." *Id.* Each time, however, Homeward refused to correct its error or justify the increase. Moreover,

10

"Homeward's agents frequently" contacted McGinnis and Adam "by phone and mail" such that according to Adam, Homeward's demands became "a constant fixture of their lives." *Id.* at 1258. Indeed, the correspondence was so extensive that the collection letters stacked together reached five feet high. *Id.* Homeward also began placing each of McGinnis's monthly payments into a suspense account from which it "deducted, as its own income, late fees and other expenses," *McGinnis*, 240 F. Supp. 3d at 1351, numerous times over the course of five months, *McGinnis*, 817 F.3d at 1248, which, as noted below, facilitated the collection of more monies to which it was not entitled.

Fifth, Homeward's conduct went well beyond a calculation error. As we previously noted, Homeward's failure to explain, even at trial, how it arrived at the payment amount "speaks volumes" about its conduct. *McGinnis*, 817 F.3d at 1257. Homeward had numerous opportunities to correct any error but failed to do so each time. And when Adam and Jane reached out for help Homeward responded "with indifference, obstinacy, and, at times, belligerence." *McGinnis*, 240 F. Supp. 3d at 1350. Homeward also repeatedly contacted Jane and Adam to demand payment of an amount to which it knew it was not entitled. *McGinnis*, 817 F.3d at 1258. Indeed, "we [found] Homeward's awareness of its error rendered its opaqueness, unresponsiveness, and belligerence—in pursuing foreclosure in a fairly short

11

amount of time for a relatively small amount of money—extreme and outrageous as a matter of law." *Id.* at 1259. Such conduct is more than mere accident.

Homeward's use of the suspense account also involved intentional malice, trickery, or deceit. Homeward's placement of McGinnis's monthly payments in a suspense account, rather than crediting those payments to her account, allowed it to collect fees and expenses that Homeward knew McGinnis did not owe. *McGinnis*, 240 F. Supp. 3d at 1351. The jury determined that such conduct amounted to unlawful conversion—an intentional tort. *Id.* That is no surprise. Homeward knew that it had increased McGinnis's monthly payment beyond what was owed because McGinnis repeatedly pointed out the error. *Id.* Therefore, Homeward knew that the fees and expenses it deducted from the suspense account were not in fact due but deducted them anyway. *Id.* And Homeward knew that the suspense account would pressure McGinnis to pay the disputed amount in order to stop the deduction of late fees or to avoid foreclosure. *Id.* Thus, each of the *State Farm* sub-factors supports the conclusion that Homeward's conduct was highly reprehensible.

Turning to the second *Gore* guidepost, we consider whether the ratio of punitive damages to compensatory damages awarded by the jury in this case—5.9:1—is unconstitutionally excessive. We conclude that it is not. As an initial matter, the Supreme Court has approved of "single-digit multipliers" as "more likely to comport with due process, while still achieving the State's goals of

12

deterrence and retribution, than awards with [higher] ratios." *State Farm*, 538 U.S. at 425.

Homeward argues that even a single-digit ratio award offends due process in this case because of McGinnis's substantial recovery of other damages. Homeward relies on dicta in *State Farm* suggesting that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.* However, in that same discussion the Supreme Court made clear that its suggested ratios were intended to be "instructive" and that "[t]he precise award in any case . . . must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Id.* Further, we have upheld ratios substantially greater than 1:1 in cases with large compensatory damages awards. In *Action Marine*, we upheld a punitive damages award of $17.5 million despite a sizeable $3.2 million compensatory damages award (a ratio of nearly 5.5:1) where the defendant's conduct was "exceedingly reprehensible." 481 F.3d at 1321. Similarly, in *Goldsmith*, we upheld a ratio of 9.2:1 on the basis of particularly reprehensible behavior after the jury awarded $54,321 in compensatory damages. 513 F.3d at 1283. And in *Bogle v. McClure*, 332 F.3d 1347, 1362 (11th Cir. 2003), we upheld a punitive damages award of $2,000,000 where the plaintiff recovered $500,000 in compensatory damages, a ratio of 4:1.

Homeward argues that we must discount emotional distress damages when conducting the ratio analysis, but our case law has held otherwise. In *Bogle*, we upheld a substantial punitive damages award of $2,000,000 even though the $500,000 in compensatory damages award was based entirely on emotional distress. *Id.* at 1359, 1362. Similarly, in *Goldsmith*, we made no distinction between economic and emotional distress damages when upholding a punitive damages award of $500,000 based on a $54,321 award, half of which consisted of damages for emotional distress. 513 F.3d at 1275, 1283. Further, Homeward's assertion that the damages for emotional distress contained a punitive element in this case is unfounded because the trial court instructed the jury to base its compensatory damages award only on its determination of the appropriate amount to compensate McGinnis for her injury.

The final *Gore* guidepost we must consider is the amount of civil penalties authorized or imposed in comparable cases. Homeward asks us to compare the punitive damages award to the civil penalties available under RESPA for failure to provide an escrow analysis.[4] However, Homeward has failed to identify any

---

[4] This provision of RESPA provides: "In the case of each failure to submit a statement to a borrower as required under subsection (c) of this section, the Secretary shall assess to the lender or escrow servicer failing to submit the statement a civil penalty of $50 for each such failure, but the total amount imposed on such lender or escrow servicer for all such failures during any 12-month period referred to in subsection (b) of this section may not exceed $100,000." 12 U.S.C. § 2609(d)(1). Intentional violations carry a $100 penalty and the $100,000 cap does not apply. *Id.* § 2609(d)(2).

14

similar cases in which RESPA penalties were actually applied. And, in any event, RESPA provides little if any guidance in this case because Homeward's conduct involved far more than failing to provide escrow statements. Homeward refused to justify or correct the payment increase and repeatedly demanded payments to which it knew it was not entitled through numerous phone calls and collection letters. At the same time, Homeward used a suspense account to "deduct[], as its own income," even more in late fees and expenses that it was aware were based on an unreasonable increase in McGinnis's monthly payments. *McGinnis*, 240 F. Supp. 3d at 1351.

In sum, after considering all of the *Gore* factors, we conclude that the jury's punitive damages award is not grossly excessive in relation to the State's legitimate interest in deterring Homeward's conduct, and therefore, does not violate the due process rights of Homeward.

B.    The District Court Did Not Abuse Its Discretion by Concluding the Jury's Finding of Specific Intent Was Not against the Weight of Evidence.

We review the district court's decision to deny a new trial for abuse of discretion.[5] Rule 59 of the Federal Rules of Civil Procedure[6] allows a district court

---

[5] McGinnis argues that Homeward lost its right to challenge the jury's finding of specific intent under Rule 59 because it failed to make that argument under Rule 50. We disagree. This Court instructed the district court on remand to consider "Homeward's Rule 59 motion for a new trial on the issue of punitive damages." *McGinnis*, 817 F.3d at 1264. And although a movant cannot use Rule 59 to press matters that could have been pressed earlier, *Michael Linet, Inc. v. Village of Wellington, Fla.*, 408 F.3d 757, 763 (11th Cir. 2005), Rule 50 motions "are not prerequisites

to order a new trial if it determines that that the jury's verdict is against the weight of the evidence presented at trial. *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940); *Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1556 (11th Cir. 1984).

Homeward argues that the punitive damages award unlawfully exceeded the $250,000 statutory cap in O.C.G.A. § 51-12-5.1(g) because there was no evidence from which a jury could conclude that it acted with the specific intent to harm McGinnis. Georgia law caps punitive damages at $250,000 unless "it is found that the defendant acted, or failed to act, with the specific intent to cause harm," in which case there is no statutory limitation. O.C.G.A. § 51-12-5.1(f), (g). Specific intent to cause harm exists where an actor desires to cause the harm resulting from his or her actions or believes that the resulting harm is substantially certain to result from his or her actions. *Action Marine*, 481 F.3d at 1313.[7] In other words, specific intent can be established by showing that the actor engaged in a course of conduct even though he or she believed the conduct was almost certain to cause

---

to a motion for a new trial," *Urti v. Transp. Commercial Corp.*, 479 F.2d 766, 769 (5th Cir. 1973). Here, Homeward's argument that the jury's finding of specific intent is against the weight of the evidence could not have been made until after the jury reached a verdict.

[6] "The court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows: . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59.

[7] The district court in the instant case gave the jury an instruction on the definition of specific intent nearly identical to the definition used by the *Action Marine* court. *See Action Marine*, 481 F.3d at 1313. Because Homeward did not object to that instruction it cannot now argue that more is required to establish specific intent. *See id.*

16

harm. *McGinnis*, 240 F. Supp. 3d at 1349.[8] The district court determined that it was not against the weight of the evidence for the jury to conclude that Homeward knew its conduct was substantially certain to cause McGinnis emotional harm from four pieces of evidence: Homeward's awareness of its error and refusal to retract its demands, Homeward's use of the suspense account, Homeward's knowledge of the emotional harm suffered by McGinnis, and Homeward's offer to avoid foreclosure. We agree.

First, the jury's finding of specific intent was supported by evidence showing Homeward knew its escrow analysis was in error yet proceeded to demand payment repeatedly without explanation and then foreclose on McGinnis's property. *See DeGolyer v. Green Tree Servicing, LLC*, 291 Ga. App. 444, 450, 662 S.E.2d 141, 148 (2008) (concluding that proceeding to foreclosure based on a known calculation error could constitute extreme or outrageous conduct supporting a claim for IIED). At trial, McGinnis presented evidence that she and Adam repeatedly made good-faith attempts to inform Homeward of its escrow calculation error. *McGinnis*, 817 F.3d at 1259. Undeterred, Homeward continued to demand payment of the unexplained amount, collect unwarranted late fees, and proceed to

---

[8] Homeward argues that an intentional tort is not the same as specific intent. That is correct. But as the district court explained, specific intent does not only mean having the desire to cause harm but also "engag[ing] in a course of conduct despite knowing that it would almost certainly" cause harm. *McGinnis*, 240 F. Supp. 3d at 1349. It is the latter meaning of specific intent that the district court determined, and we agree, a jury could find supported by the evidence here.

foreclosure without ever justifying the increase. And, even at trial, Homeward failed to produce any justification for the increase and insisted that McGinnis was required to pay any amount Homeward demanded. *McGinnis*, 817 F.3d at 1259.

Second, Homeward's use of the suspense account could support the jury's finding of specific intent. The evidence at trial showed that once McGinnis refused to pay the unexplained increase, Homeward began putting her payments in a suspense account from which it "deducted, as its own income, late fees and other expenses." *McGinnis*, 240 F. Supp. 3d at 1351. Further, "according to the evidence, Homeward was, while collecting these fees, also aware that it had increased McGinnis's monthly escrow payment by more than 300 percent," *id.*, and as a consequence, that the fees and penalties were not in fact owed. Therefore, "the jury could have considered Homeward's use of the suspense account as evidence of specific intent to harm" McGinnis by forcing her "to pay amounts in excess of what she owed, by requiring her to pay penalties and fees . . . or by decreasing the likelihood that she would be able to cure the default and avoid foreclosure." *Id.*

Third, a jury could infer from the evidence that Homeward knew its conduct was substantially certain to cause McGinnis emotional harm. The evidence showed that Adam explained to Homeward in writing that its conduct was causing him and Jane "und[ue] stress" and mentioned over the phone the frustration caused by Homeward's conduct. In addition, as the district court explained, a jury could infer

18

that Homeward knew its conduct was substantially certain to cause emotional distress from "the sheer volume of adversarial communications . . . and looming threats of foreclosure." *McGinnis*, 240 F. Supp. 3d at 1352. We explained similarly in the prior appeal in this case that "Homeward almost certainly learned the stakes involved with the foreclosure," including McGinnis's livelihood and reputation in the community. *McGinnis*, 817 F.3d at 1259. Accordingly, the jury's finding of specific intent was supported by evidence that Homeward knew its conduct was almost certain to cause McGinnis emotional harm.[9]

Finally, the district court did not abuse its discretion by concluding that Homeward's offer to let McGinnis bring her account current and avoid foreclosure was not contrary to the jury's finding of specific intent. Although McGinnis could have avoided foreclosure, she "would have had to give in to all of Homeward's existing demands," including by paying the unexplained monthly payment amount as well as all of the late fees and penalties. *McGinnis*, 240 F. Supp. 3d at 1352. In other words, she would have suffered the same harm even if she brought the account current. Therefore, Homeward's offer to allow McGinnis to bring the

---

[9] Homeward argues that because it directed most of its correspondence to Adam, it could not have known its conduct was causing Jane emotional harm. We are unpersuaded. Jane was present on at least some of the phone calls between Adam and Homeward (and certainly should be expected to be aware of correspondence regarding her property, even if addressed to Adam). Adam also informed Homeward that the correspondence was causing both of them "und[ue] stress." Moreover, it is hard to see how Homeward could believe that Adam, as Jane's agent, was not telling her everything that was happening.

19

account current does not contradict the jury's finding that Homeward knew its conduct was substantially certain to cause McGinnis harm regardless of whether she brought the account current. In sum, we conclude that the district court did not abuse its discretion by determining that the jury's finding of specific intent was not against the weight of evidence.

Homeward also argues that upholding the district court's decision not to reverse the jury's award in the instant case would make a substantial punitive damages award available in every foreclosure action wrongful or not. We disagree. Homeward's conduct went well beyond ordinary threats to foreclose. McGinnis repeatedly attempted to notify Homeward of the error in its billing, but Homeward never retracted or justified its demands. In fact, it continued to demand that McGinnis make the increased payments even at trial where Homeward's only witness maintained that McGinnis was obligated to pay any amount Homeward demanded whether reasonable or in error. Adam testified that Homeward's demands had "become a constant fixture of [Jane and Adam's] lives and resulted in a stack of collection letters that would reach five feet high. *McGinnis*, 817 F.3d at 1258. Homeward continued to send those demands and threaten foreclosure even though it knew that those demands were unreasonable and that its actions were causing McGinnis harm. At the same time, Homeward used a suspense account to

20

collect even more money to which it was not entitled by way of fees and expenses.

The egregious actions in this case were not typical.

## V.    <u>CONCLUSION</u>

The judgment of the district court is **AFFIRMED**.